## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **JENNIFER ROUNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:06-CV-00188** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Jennifer Rouns appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Rouns applied for DIB and SSI on May 8, 2002, alleging that she became disabled as of January 1, 1997. (Tr. 78-80.)  The Commissioner denied her application initially and upon reconsideration, and Rouns requested an administrative hearing. (Tr. 28-30, 39, 47-50.)  On October 12, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Rouns, who was represented by counsel, her mother, and a vocational expert testified. (Tr. 753-97.)  On May 18, 2005, the ALJ rendered an unfavorable decision to Rouns, concluding that

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

she was not disabled because despite the limitations caused by her impairments, she could

perform her past relevant work as a waitress, as well as a significant number of other jobs in the

economic region. (Tr. 13-27.)  The Appeals Council denied Rouns's request for review, making

the ALJ's decision the final decision of the Commissioner. (Tr. 9-12, 747-52.)

Accordingly, Rouns filed a complaint with this Court on May 5, 2006, seeking relief

from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's

review as of December 29, 2006. (*See* Docket # 13-21.)

## II.  ROUNS'S ARGUMENTS

Rouns alleges two errors in the Commissioner's final decision.  Specifically, Rouns

claims that the ALJ erred by: (1) determining that her testimony of debilitating limitations was

not "fully credible" and (2) improperly discounting the October 2003 opinion of Dr. Mastbaum,

her treating endocrinologist, who stated that her medical condition "warrants disability."

(Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 13-16.)

## III.  FACTUAL BACKGROUND[2]

### A.  Background and Daily Activities

At the time of the ALJ's decision, Rouns was twenty-seven years old, had a GED,[3] and

possessed work experience as a receptionist, waitress, hostess, certified nursing assistant, and

---

[2] The administrative record in this case is voluminous (797 pages), and the parties' disputes involve only
small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record
necessary to the decision.

[3] Rouns explained that she was placed in a "class for emotionally handicap[ped] students" during high
school, ultimately leaving school before completing the eleventh grade. (Tr. 176, 710.)

cashier.[4] (Tr. 78, 176, 209.)  Rouns alleged in her DIB application that she became disabled as of January 1, 1997, due to diabetes, asthma, hypothyroidism, neuropathy, nephropathy, heart murmur, anemia, depression, post traumatic stress syndrome, and a right wrist condition.[5] (Tr. 170.)

At the hearing, Rouns testified that she lives independently in a trailer, spending her days caring for her two sons, who are ages two and four. (Tr. 757, 771.)  She reported that she independently cares for her own personal needs, maintains her home, cares for her children, and drives a car. (Tr. 782-83.)  Rouns confided that she has no social activities or hobbies. (Tr. 783.)

When asked to describe her routine on a typical day, Rouns stated that she gets up at 10:00 a.m. and helps her sons get dressed. (Tr. 763.)  Her sons then watch a movie while she lays down for forty-five minutes. (Tr. 763.)  After resting, she fixes the boys a "quick and easy" lunch, after which they help her with household tasks such as taking out the garbage. (Tr. 764.) After some play time, Rouns explained that all three of them will nap for about two hours. (Tr. 764.)  She stated that in the evening she may take her sons to visit their babysitter or that they simply watch television at home. (Tr. 765.)  After the boys go to bed, Rouns reported that she will try to do a few more housekeeping tasks, resting frequently during the tasks. (Tr. 765.)

Rouns clarified, however, that her daily routine varies based on whether she is having a

---

[4] Although she worked as a certified nursing assistant from 1997 to 1998, most of Rouns's jobs were short-term; she explained that she quit or was terminated from many jobs because she accumulated "[t]oo many absences." (Tr. 120, 778-79.)

[5] Curiously, in contrast to the onset date of January 1, 1997, reflected on her DIB and SSI applications, Rouns represented on her Disability Report that she became unable to work four years later, on January 1, 2001. (*Compare* Tr. 78, 742, *with* Tr. 170.)

"good day" or a "bad day," explaining that she generally does not feel well three to five days per week. (Tr. 762-63.)  Rouns reported that she naps for two to three hours on a "good day," but that she must lie down for three to five hours during an eight-hour period on a "bad day." (Tr. 762-63.)  She confided that moving around the house causes her to "get out of breath and [her] heart starts pounding" due to her asthma and "heart palpitations," so she takes frequent rest periods when performing any activity. (Tr. 765, 784.)  She explained that a lot of the time she has to watch her sons from the couch and that on some of her "bad days," she has a friend help her with the children. (Tr. 763, 765-66.)

In addition, Rouns reported that she suffers from back pain due to "problems with [her] sciatic nerves since [she] was in high school" and that she "walk[s] with a limp due to the pain in [her] back that shoots down [her] leg." (Tr. 775, 781, 784.)  She stated that she was recently referred to physical therapy for her back pain but that she was waiting for Medicaid to approve the treatment. (Tr. 775.)

Rouns went on to explain that she gets migraines "three to four times a week" that cause her to experience tunnel vision; nausea; and a heightened sensitivity to movement, light, and sound. (Tr. 766.)  She stated that even when taking medication her symptoms interfere with her ability to function for at least two to two-and-a-half hours per day, three to four days per week. (Tr. 767.)

Moreover, Rouns explained that she has "had depression for quite some time" and that she "just feel[s] worthless." (Tr. 768, 770.)  She confided that "things that were done to [her] by [her] father when [she] was very little" now cause her to experience depression, nightmares, and "suicidal thoughts at times." (Tr. 768.)  She explained that the nightmares cause her to be "very

4

lethargic and very slowed down" the next day and that "the only thing that keeps [her] going is the fact that [her] children need [her]." (Tr. 768-69.)  She further reported that her psychological stress impacts her ability to control her diabetes. (Tr. 770.)  Nonetheless, Rouns admitted that she had not recently taken any medication for her psychological symptoms, explaining that she and her mother decided to discontinue her use of antidepressants when she was younger due to a concern of side effects.[6] (Tr. 770.)

> B.  Summary of the Medical Evidence Pertaining to Rouns's Physical Impairments

Dr. Leonard Mastbaum, an endocrinologist, has treated Rouns for diabetes since at least 1994. (Tr. 572-82.)  On January 19, 1998, Rouns visited Dr. Mastbaum for the first time in two to three years, reporting that her control over her diabetes was deteriorating and that she was experiencing fatigue. (Tr. 568-70.)  Rouns, however, did not return to Dr. Mastbaum until July 7, 1999, causing him to note that no physician was managing her insulin. (Tr. 382, 566.)  At that visit, Dr. Mastbaum observed that Rouns exhibited no lesions and that her feet were "good"; however, he also opined that Rouns might have early neuropathy based on her report of her symptoms. (Tr. 566.)

On July 13, 1999, Rouns visited Dr. Mastbaum, who determined that Rouns was pregnant and in poor control of her diabetes. (Tr. 565.)  He advised her to keep weekly appointments during the following months, the results of which evidenced that her blood sugar levels were erratic. (Tr. 552, 557, 561-65.)  In fact, when Rouns was hospitalized for a urinary tract infection, the physician noted that the diabetes had affected her kidneys. (Tr. 558.)

---

[6] Rouns's mother also testified at the hearing and essentially corroborated Rouns's own testimony. (*See* Tr. 787-89.)

5

Consequently, on September 1, 1999, Dr. Mastbaum recommended that Rouns have an insulin pump implanted, which was done one month later. (Tr. 386-90, 555-56.)  On October 16, 1999, Dr. Mastbaum noted that Rouns's blood sugar levels had improved even though her recurrent urinary tract infections caused them to fluctuate. (Tr. 545-46.)  He also noted that Rouns had mild diabetic neuropathy, but no retinopathy. (Tr. 545-46.)  On October 26, 1999, Dr. Mastbaum noted that Rouns's glucose levels were "excellent." (Tr. 544.)

On March 15, 2000, Dr. Michael Holton performed a consultative physical examination of Rouns at the request of the Social Security Administration. (Tr. 424-27.)  He found that she had no difficulty getting on and off the table; that her lungs and cardiovascular system were normal; that her gait and station were normal; that she had full muscle strength and tone throughout her extremities; that her fine finger manipulation was normal; and that she had full and symmetrical peripheral pulses. (Tr. 425.)  He noted, however, that Rouns guarded her right wrist significantly, that her grip strength on the right was less than on the left, and that her right wrist was tender to the touch. (Tr. 425.)  He assigned her a diagnosis of insulin dependent diabetes with end organ involvement and associated impairments, asthma, chronic right wrist pain, and hypothyroidism. (Tr. 426.)

On April 18, 2000, Dr. P. Montoya reviewed the medical evidence relating to Rouns's physical condition. (Tr. 429.)  He concluded that she could lift ten pounds frequently and twenty pounds occasionally, and that she could sit or stand and walk for at least six hours in an eight-hour workday. (Tr. 429.)  Dr. Montoya also opined that Rouns could perform only occasional postural activities and that she might have some occasional difficulty with gross manipulation in her right hand. (Tr. 431.)

On June 18, 2001, Rouns reported to Dr. Mastbaum that she was doing well and that she had no concerns, though she was not recording her blood sugars. (Tr. 535.)  However, in late 2001 and early 2002, Rouns again experienced pregnancy-related difficulty in controlling her asthma and blood sugar levels, including at least one occasion where she became disoriented and then unconscious. (Tr. 449-50, 453-54, 458-62, 466, 470, 474, 490, 533-34, 588-92.)  On that occasion, it was discovered that Rouns's insulin pump had been turned off and that she had not changed the tubing in several days. (Tr. 449.)  On other occasions during her pregnancy, her physicians documented concerns that she was not compliant with her medication and that she was not using her insulin pump properly. (Tr. 477-78.)

On March 3, 2002, Rouns was admitted to the hospital with low blood sugar, and she was found to be noncompliant with her insulin. (Tr. 503.)  On July 22, 2002, Rouns visited the Family Practice Clinic, who noted that she had slightly decreased sensation in one toe but that the sensation in her feet was otherwise intact; that she had normal radial and peripheral pulses; and that she had normal sensation in her fingers. (Tr. 731.)  She also told the Family Practice Clinic that she had argued with Dr. Mastbaum's office and did not want to see him again; the Clinic urged her to follow up with Dr. Mastbaum. (Tr. 731.)

On June 29, 2002, Rouns underwent a consultative internal medicine examination performed by Dr. Nathan Foote. (Tr. 504-06.)  His examination revealed that her lungs were clear; that her cardiac system was regular without any murmurs; that she had normal gait and station and full range of motion with no tenderness; that she had full and symmetrical muscle strength and good hand strength; and that she had normal brain functions. (Tr. 505-06.)  Dr. Foote opined that Rouns appeared to be doing an excellent job of controlling her diabetes and

asthma and that her medical conditions did not affect her daily activity. (Tr. 505.)

On January 9, 2003, Rouns went to the emergency room due to an asthma attack; while there, she was also treated for low blood sugar levels. (Tr. 699-700.)  In March 2003, Rouns was hospitalized for a urinary tract infection that caused her blood sugar levels to fluctuate; however, once she was able to eat more regularly, her blood sugar levels stabilized. (Tr. 683-86.)  On August 2, 2003, Rouns visited the hospital due to shortness of breath, confiding that she had been out of insulin supplies for the past month; she was diagnosed with hypoglycemia and discharged once her blood sugar levels increased. (Tr. 613-14.)

On September 25, 2003, Rouns visited Dr. Carter of the Family Practice Clinic, complaining of respiratory and urinary tract infections and pain in her right lower back; a physical examination revealed mild tenderness in the muscles along her spine. (Tr. 727.)  On October 9, 2003, Rouns visited the emergency room complaining of back and neck pain after an automobile accident. (Tr. 658-62.)  A physical examination revealed tenderness and reduced range of motion in her neck and pain along the right side of her spine; however, the results of an MRI and echocardiogram were normal. (Tr. 659, 665, 725.)  She was diagnosed with a cervical strain. (Tr. 659.)

On October 21, 2003, Dr. Mastbaum penned a letter addressed "To Whom It May Concern," stating that Rouns's blood sugar levels were erratic and poorly controlled; that she frequently experienced activity-related hypoglycemia; that a history of low blood sugar had "prevented her from holding a meaningful or permanent job"; that her hypothyroid condition was uncontrolled; that back pain prevented her from lifting and standing; and that her asthma condition flared frequently. (Tr. 529.)  He stated that he believed her medical complications were

8

"severe enough to preclude employment and warrant[] disability." (Tr. 529.)

On March 2, 2004, Rouns returned to Dr. Mastbaum, who noted that her breathing was normal and that her feet were "ok." (Tr. 624.)  He concluded that her diabetes was well controlled, though she was also experiencing hypoglycemia and taking medication for hypothyroidism. (Tr. 625.)  She complained to Dr. Mastbaum of back pain, cataracts, and a heart murmur. (Tr. 625.)  Dr. Mastbaum then wrote a second letter addressed "To Whom It May Concern," essentially reiterating his October 2003 assessment; however, in this letter Dr. Mastbaum did not express the opinion that Rouns's medical status "warrants disability"; rather, he simply stated that her "health problems are chronic and will not be resolved or improve with time." (Tr. 528.)

On August 25, 2004, Rouns again visited Dr. Carter, complaining of diabetic ulcers on her right foot and lower left leg; a physical examination revealed that Rouns had moderate peripheral neuropathy in her feet. (Tr. 721.)  On September 22, 2004, Dr. Carter noted that Rouns's ulcers were healing well but that she complained of chronic low back pain. (Tr. 720.)  A musculoskeletal examination revealed no radicular pain with straight leg raising tests but that Rouns experienced tenderness in the muscles along her lower spine. (Tr. 720.)

 *C.  Summary of the Medical Evidence Pertaining to Rouns's Psychological Impairments*

On January 15, 2000, Rouns was evaluated by Kenneth Bundza, Ph.D., at the request of the Social Security Administration. (Tr. 407.)  Rouns described her history of being sexually abused as a child and her "off and on" depressive episodes throughout her teen years, including a hospitalization at age fourteen and a year of outpatient treatment. (Tr. 407.)  She stated that she currently had symptoms of excessive sleep, irritability, crying jags, and low energy, explaining

that she felt "lonely and trapped." (Tr. 407.)  She admitted that she had used antidepressants in the past but that she was not currently taking any medication or participating in any kind of treatment. (Tr. 407.)

Dr. Bundza observed that Rouns did not appear to be in any acute emotional distress and that she did not evidence any problems with judgment, common sense, abstract reasoning, or short or long term memory. (Tr. 407-09.)  Thus, Dr. Bundza concluded that his examination results indicated that Rouns had at least average intelligence and no cognitive impairment. (Tr. 407-09.)  He further opined that Rouns was currently experiencing some mild depressive symptoms, commenting that a variety of psychological stressors were probably exacerbating her problems. (Tr. 409.)  He opined that between her physical and psychological problems, her depression was "probably the least of her worries and the least disabling . . . ." (Tr. 409.)  He assigned her a diagnosis of depression, recurrent, mild. (Tr. 409.)

On February 21, 2000, R. Klion, Ph.D., reviewed Rouns's medical records. (Tr. 415-23.) He opined that Rouns had an affective disorder but no serious mental impairment; that she had only "slight" limitations in her activities of daily living and social functioning; and that she only experienced "seldom" deficiencies of concentration, persistence, or pace as a result of her mental status. (Tr. 422.)

On July 26, 2002, Rouns underwent an evaluation by Candace Martin, Ph.D., at the request of the Social Security Administration. (Tr. 522-25.)  Rouns reported her history of depression to Dr. Martin, asserting that she has been suicidal in the past and that she continued to have suicidal thoughts; she confided that her sons are the only thing that keeps her alive. (Tr. 522.)  On mental status examination, Dr. Martin found that Rouns's mood was normal to the

10

situation and generally euthymic, although she was somewhat discouraged when talking about her depression. (Tr. 523.) Dr. Martin further noted that Rouns's social skills and ability to establish rapport were "quite good." (Tr. 523.) Overall, Dr. Martin opined that Rouns appeared to be "an individual of average intelligence with a good general understanding of life skills, memory, sustained concentration and persistence, social abilities, and adaption." (Tr. 524.) She assigned her a GAF score of sixty,[7] commenting that Rouns appeared "to be able to function independently in all regards . . . . limited only in respect to the limits of her medical complaints." (Tr. 525-26.)

On September 6, 2002, J. Pressner, Ph.D., reviewed Rouns's mental health records at the request of the Social Security Administration. (Tr. 508-21.) He concluded that her mental impairment was not severe and that she had only a mild restriction in her activities of daily living, her ability to maintain social functioning, and her ability to maintain persistence, concentration, and pace. (Tr. 508-21.) Dr. Klion, another state agency psychologist, later affirmed Dr. Pressner's opinion. (Tr. 508.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

---

[7] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). A GAF score of sixty means an individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning. *Id.*

supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[8] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On May 18, 2005, the ALJ rendered his opinion. (Tr. 16-27.)  He found at step one of the five-step analysis that Rouns had engaged in some substantial gainful activity beyond her alleged onset date but not after October 16, 1998, and at step two that she had severe impairments with respect to her diabetes mellitus, asthma, kidney problem, and problem with her right hand. (Tr. 26.)  However, at step three, he determined that Rouns's impairments were not severe enough to meet a listing. (Tr. 26.)  Before proceeding to step four, the ALJ determined that Rouns had the following RFC:

> a residual functional capacity for light work with no work requirement for gross manipulation with the right dominant hand, no lifting more than 14.5 pounds with the right hand, lifting of 20 pounds with the left hand, and work that avoids concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gases, and poor ventilation. (Tr. 26.)

---

[8] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Based on this RFC, the ALJ concluded at step four that Rouns could perform her past relevant work as a waitress. (Tr. 26.)  In addition, the ALJ proceeded to step five where he determined that, considering her age, education, and experience, Rouns could perform a significant number of other jobs within the economic region. (Tr. 25.)  Therefore, Rouns's claim for DIB was denied. (Tr. 26.)

Rouns claims, however, that the ALJ erred in denying her DIB and SSI applications by: (1) determining that her testimony of debilitating limitations was not "fully credible" and (2) improperly discounting the October 2003 opinion of Dr. Mastbaum, her treating endocrinologist, who stated that her medical condition "warrants disability."  While each argument will be discussed in turn, ultimately neither merits a remand of the Commissioner's final decision.

### C. The ALJ's Credibility Determination Will Not Be Overturned

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ made the following credibility determination:

The claimant's testimony is not found to be fully credible, as it is not supported by the objective medical evidence of record or by her activities of daily living. The claimant testified to a number of limitations including her back, which caused her to limp and pain to shoot down her legs, but there are no objective findings to support more than a mild related limitation of function. Further, the claimant's activities of daily living, which include the raising of two small children by a single mother, indicates a capacity not more limited than the residual functional capacity acknowledged herein.

(Tr. 24.)

In attacking this credibility analysis, Rouns contends that the ALJ erred when he stated that her testimony was "not supported by the objective medical evidence." (Opening Br. at 14-15.) Though Rouns concedes that the record is void of objective evidence supporting her complaints concerning her back, (Opening Br. at 16), she emphasizes that her diabetes with hypoglycemia and her hypothyroidism are conditions which can reasonably be expected to produce fatigue. *See generally* SSR 96-7p ("No symptom or combination of symptoms can be the basis for a finding of disability, . . . unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."). Thus, as Rouns's argument goes, her subjective limitations were indeed supported by objective medical evidence of record – her diabetes and hypothyroidism diagnoses.

Rouns's argument, however, amounts to no more than a nitpicking of the ALJ's explanation of his credibility determination. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). The ALJ *expressly acknowledged* that her hypothyroidism could cause "tiredness, lethargy and sensitivity to cold" and then accommodated this condition by limiting her to light work that avoids concentrated exposure to extreme cold,

wet, or humid environments. (Tr. 23, 26.)  Thus, the ALJ did not totally discredit Rouns's claims

of fatigue; rather, he simply concluded that the extent of her subjective limitations were not

"fully credible" in light of the objective medical evidence, which included reports that her

hypothyroidism was "mild and stable." (Tr. 23); *Powers*, 207 F.3d at 435-36 ("The discrepancy

between the degree of pain attested to by the witness and that suggested by the medical evidence

is probative that the witness may be exaggerating her condition."); *Gray v. Barnhart*, No. IP 01-

0872-C-T/F, 2002 WL 31242221, at *9 (S.D. Ind. July 18, 2002).  Thus, Rouns's argument is

unpersuasive.

Second, Rouns contends that the ALJ failed to consider her psychological problems,

which the ALJ considered non-severe, in combination with her physical impairments when

determining the credibility of her complaints. (Opening Br. at 14.)  Specifically, she asserts that

her history of depression and post traumatic stress disorder make her physical ailments more

difficult to cope with, explaining that during high school the combination of her physical and

mental health problems "often made it impossible for her to function in a positive way," resulted

in her placement in a "structured setting for emotional support," and contributed to her frequent

absenteeism. (Opening Br. at 14.)

Contrary to Rouns's assertion, "[n]o evidence in the record suggests that the ALJ failed

to consider the combined effects of [Rouns's] impairments." *Robinson v. Apfel*, No. 97 C 8727,

1999 WL 160068, at *7 (N.D. Ill. March 12, 1999).  Rather, the ALJ specifically explained that

the RFC by definition considers "the effects of physical and/or mental limitations that affect the

ability to perform work-related tasks." (Tr. 20 (citations omitted).)

Furthermore, Rouns does not explain how her current psychological condition, for which

she takes no medication nor participates in any treatment, would have a direct effect on her ability to perform light work. *See Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("There is no evidence that [claimant's] obesity would have a *direct* effect on her ability to do sedentary work . . . ."). Clearly, the ALJ thoroughly addressed Rouns's mental status in his opinion (penning four paragraphs on it nonetheless), (*see* Tr. 18-19), noting the results of two consultative psychological examinations and the review by the state agency psychologist that indicated Rouns's depression caused only mild limitations of function.

Thus, the ALJ certainly did not turn a blind eye to Rouns's minimal problems with depression and subsequently did not err when assessing them. *Compare Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the [obesity] issue with the aggregate effect of her other impairments."), *with Johnson*, 449 F.3d at 807 (7th Cir. 2006) ("[T]here is no indication that in assessing [the claimant's] joint problems the administrative law judge gave insufficient weight to the effect on them of [the claimant's] obesity, which is anyway not extreme."). Therefore, Rouns's second attack on the ALJ's credibility determination fails to warrant a remand.

Finally, the Court turns to the argument leading Rouns's attack on the ALJ's credibility determination – that the ALJ improperly equated her performance of child care and household duties with an ability to perform substantial gainful activity. (Opening Br. at 13-14.) In support of her argument, Rouns cites *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), asserting that "there is no significant difference" between her case and *Gentle*. (Reply Br. at 2.)

In *Gentle*, the claimant, who was obese and a "slow learner," suffered from severe pain caused by spinal disk disease, making it difficult for her to stand, walk, sit, or perform heavy

17

lifting. *Gentle*, 430 F.3d at 866-67.  The Court of Appeals found the ALJ's credibility analysis deficient because when concluding that she could return to her previous non-sedentary work the ALJ "attached great significance" to the fact that Gentle was able to perform an extensive range of activities of daily living that included caring for her two small children. *Id*.  The Court of Appeals opined: "The administrative law judge's casual equating of household work to work in the labor market cannot stand.  Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts." *Id*.

Contrary to Rouns's argument, this Court does detect "significant differences" between *Gentle* and the instant case.  First, Gentle's back pain was supported by objective medical evidence of degenerative disk disease; here, Rouns admits that the record is void of objective findings to support her complaints of a back condition.  As the ALJ explained, he did not solely rely upon a perceived inconsistency between Rouns's subjective complaints and her daily living activities when determining that she was not "fully credible"; rather, he also emphasized that Rouns's complaints were not fully believable in light of the objective medical evidence.  Indeed, the Seventh Circuit Court of Appeals has upheld credibility determinations when ALJs discredited claimants based on other factors in addition to the claimant's daily activities. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004); *Jens*, 347 F.3d at 213-14; *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).

Furthermore, in *Gentle* the Court of Appeals thought it pivotal that Gentle solely cared for her eleven-month-old infant during the day while her older child went to school. *Gentle*, 430 F.3d at 866-68.  The Court of Appeals stated: "A more important point is that taking care of an

18

infant, although demanding, has a degree of flexibility that work in the workplace does not. You can park the infant in a playpen for much of the day, and anyway it will sleep much of the day (on average about 2 to 4 hours), . . . and so the caretaker will have numerous breaks in which to rest." *Id.* (internal citations omitted); *see also Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.").

In contrast to *Gentle*, Rouns cares all day for her four-year-old and her two-year-old sons, children that she admits are "very active." (Tr. 766.) Though she states she is "not able to chase after them like they need," Rouns reports that she at times takes them on walks, plays with them outside, takes them grocery shopping, and generally goes on a daily outing with them, which includes loading them into car seats. (Tr. 130, 132, 191, 766.)

Moreover, in *Gentle*, the Court of Appeals also found it significant that the claimant relied upon her sister, a neighbor, and another woman to assist her in performing her household tasks and child care. *Gentle*, 430 F.3d at 867; *see also Mendez*, 439 F.3d at 362-63 (considering it probative that the claimant received assistance from others while caring for her four children). In contrast, here the ALJ emphasized that Rouns essentially performed her childcare and household duties single-handedly, only occasionally relying on a friend to assist her. *Cf. Mendez*, 439 F.3d at 362-63; *Gentle*, 430 F.3d at 866-68.

Indeed, it is important to remember that the holding in *Gentle* does not mean that a claimant's daily activities are irrelevant; rather, 20 C.F.R. § 404.1529(c)(3) *specifically instructs* an ALJ to consider a claimant's daily activities when evaluating her subjective complaints. *See*

SSR 96-7p.  Consequently, the ALJ did not err when he considered as a factor in his credibility

analysis that Rouns cared for two "very active" small children with very little outside assistance

and that she independently performed her household duties, including driving her children to

various appointments or outings on a regular basis. *See Jones v. Barnhart*, No. 04 C 3532, 2005

WL 66072, at *10 (N.D. Ill. Jan. 10, 2005) (considering claimant's ability to care for his two

children, perform household chores, drive a car, and maintain his personal grooming as probative

of the credibility of his testimony of debilitating limitations).

      Therefore, the ALJ was not "patently wrong" when he discounted the credibility of

Rouns's subjective complaints after finding them inconsistent with the objective medical

evidence and Rouns's daily living activities. *Powers*, 207 F.3d at 435; *see generally Rice*, 384

F.3d at 371 ("All of the ALJ's analysis is amply supported by the hearing record, and [the

claimant's] argument amounts to nothing more than a dislike of the ALJ's phraseology.").

Consequently, the ALJ's credibility determination will not be disturbed.

      *D.  The ALJ Did Not Err in Discounting the Opinion of Dr. Mastbaum*

      Rouns also contends that the ALJ erred by improperly discounting Dr. Mastbaum's

October 2003 letter, which stated that her hypoglycemia "prevented her from holding a

meaningful or permanent job" and that "her medical complications are severe enough to preclude

employment and warrant[] disability." (Tr. 529.)  Particularly, Rouns contends that the ALJ

failed to consider in his analysis that Dr. Mastbaum was a specialist and that he had treated her

for fifteen years. (Opening Br. at 15-16.)

      "A claimant is not entitled to DIB simply because his treating physician states that he is

'unable to work' or 'disabled,'" *Clifford*, 227 F.3d at 870; the determination of disability is

reserved to the Commissioner. *Id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.  "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ."[9] SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ provided five reasons why he discounted Dr. Mastbaum's October 2003 letter.  First, the ALJ observed that the opinion was "not specific" in that it merely echoed Rouns's subjective complaints and lacked the support of objective findings. (Tr. 24); *see Dixon*, 270 F.3d at 1177-78 ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.").  Next, he explained that Dr. Mastbuam's opinion was inconsistent with Rouns's daily activities, which included raising two small children

_____

[9] The factors articulated in 20 C.F.R. § 404.1527(d) include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.

as a single mother with very little assistance from others, and that his assertion that Rouns's hypothroidism was "uncontrolled" was inconsistent with other medical evidence of record indicating that it was "mild and stable." (Tr. 22-23); *see Smith v. Apfel*, 231 F.3d 433, 440-41 (7th Cir. 2000) (discounting a treating physician's opinion because it was inconsistent with other substantial evidence of record).

Moreover, the ALJ further explained that he perceived Dr. Mastbaum's opinions to be internally inconsistent. *See Smith*, 231 F.3d at 440-41 (discounting a treating physician's opinion because it was internally inconsistent). Specifically, the ALJ noted that Dr. Mastbaum's October 2003 letter stated that Rouns's medical complications were "severe enough to preclude employment and warrant[] disability" but that his letter five months later made no such assertion. In addition, the ALJ explained that Dr. Mastbaum was "making a conclusion that is reserved for the Commissioner" and that, in light of the fact that Dr. Mastbaum is not a vocational expert, he was "stepping outside of his field of expertise in making his conclusion that the claimant is disabled." (Tr. 24.)

Nonetheless, despite the thorough reasoning behind the ALJ's decision to discount Dr. Mastbaum's opinion, Rouns doggedly asserts that the ALJ erred by failing to explain "why [Dr. Mastbaum's] specialty and length of treatment did not entitle [his opinion] to great weight." (Reply Br. at 4.) Rouns elaborates: "Although the ALJ gives a number of reasons why he failed to give the opinion controlling weight, he did [not] explain why the evidence behind these reasons trump the specialty and length of treatment factors." (Reply Br. at 4.)

Rouns's argument is utterly unpersuasive. First of all, contrary to Rouns's thinking, Dr. Mastbaum's October 2003 opinion, stating that Rouns's hypoglycemia "prevented her from

holding a meaningful or permanent job" and that her medical condition "warrants disability," is not entitled to any special significance since it addresses an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(3).  Second, as described in detail *supra*, the ALJ quite thoroughly explained his rationale for discounting Dr. Mastbaum's conclusory opinion, allowing the Court to easily trace his path of reasoning, *see Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ . . . must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."), and specifically addressed several factors described in 20 C.F.R. § 404.1527, including the lack of objective findings to support Dr. Mastbaum's opinion, an inconsistency within Dr. Mastbaum's 2003 and 2004 opinions, and the inconsistency between his opinion and Rouns's daily activities.[10] *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Clearly, Rouns is simply grasping at straws in hopes of a remand by arguing that the ALJ failed to adequately consider Dr. Mastbaum's conclusory 2003 letter.  Rouns's request for a remand on this basis is futile.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

---

[10] Moreover, earlier in his opinion, the ALJ discussed the frequency of Rouns's visits with Dr. Mastbaum. (Tr. 21.)  He noted that Rouns represented that she generally visits Dr. Mastbaum every three months but that as of the date of the hearing Rouns had not seen him in the past seven months. 20 C.F.R. § 404.1527(d)(2).

Clerk is directed to enter a judgment in favor of the Commissioner and against Rouns.

      SO ORDERED.

      Enter for this 28th day of February, 2007.

                      S/Roger B. Cosbey
                      Roger B. Cosbey,
                      United States Magistrate Judge